DANIEL BOGDEN
United States Attorney
MICHAEL CHU
Assistant United States Attorney
333 Las Vegas Boulevard South, Suite 5000
Las Vegas, Nevada 89101
(702) 388-6336

LANNY A. BREUER
Assistant Attorney General
THOMAS S. DOUGHERTY
Trial Attorney
Computer Crime and Intellectual Property Section
Criminal Division, U.S. Department of Justice
1301 New York Avenue, NW, Suite 600
Washington, DC  20005
(202) 514-1026

**FILED**

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY_____DEPUTY

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| Plaintiff, | ) |
| | ) Case 2:09-cr-00173-PMP-PAL |
| v. | ) |
| | ) **PLEA MEMORANDUM** |
| RODOLFO RODRIGUEZ CABRERA, | ) |
| Defendant. | ) |

The United States, by and through Daniel Bogden, United States Attorney, Thomas Dougherty, Department of Justice Trial Attorney, and Michael Chu, Assistant United States Attorney, defendant Rodolfo Rodriguez Cabrera, defendant's attorney, Mace Yampolsky, submit this plea memorandum.

### I.

### PLEA AGREEMENT

The United States and defendant have reached the following plea agreement, which is not binding on the Court.

#### A.  __The Plea__

Defendant will plead guilty to Count 1 of the Indictment, charging him with one count of

1   conspiracy to (a) criminally infringe on a copyright, in violation of 17 U.S.C. § 506(a)(1)(A) and 18

2   U.S.C. § 2319(b)(1); (b) knowingly traffic in counterfeit and illicit labels, in violation of 18 U.S.C.

3   § 2318(a) and (c)(3); and (c) intentionally traffic in counterfeit IGT gaming software and machine

4   parts, in violation of 18 U.S.C. § 2320(a), all in violation of 18 U.S.C. § 371.  Defendant also agrees

5   to the forfeiture of the property set forth in the Forfeiture Allegations, the Second Bill of Particulars,

6   and the Plea Agreement.  At sentencing, the United States will move to dismiss the remaining counts.

7   **B.   Additional Charges**

8           The United States Attorney's Office for the District of Nevada ("United States") will bring

9   no additional charge or charges against defendant arising out of the investigation in the District of

10  Nevada which culminated in this Plea Memorandum.

11  **C.   Sentencing Guideline Calculations**

12          1.      Defendant understands that the Court is required to consider the United States

13  Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") among other factors in determining

14  defendant's sentence.  Defendant understands, however, that the Sentencing Guidelines are only

15  advisory, and that after considering the Sentencing Guidelines, the Court is free to exercise its

16  discretion to impose any reasonable sentence up to the maximum set by statute for the crimes of

17  conviction.

18          2.      Defendant and the United States agree and stipulate to the following advisory

19  sentencing guideline factors:

20          Base Offense Level [U.S.S.G. §§ 2X1.1, 2B5.3(a)]                                        8

21          Loss between $120,000 to $200,000                                                     +10
            [U.S.S.G. §§ 2B5.3(b)(1), 2B1.1(b)(1)]
22
            Offense involved the manufacture and importation of infringing items                 +2
23          [U.S.S.G. § 2B1.1(b)(9)]

24          Acceptance of Responsibility [U.S.S.G. § 3E1.1(a)]                                     -2
            (as set forth below)
25
            Timely Plea [U.S.S.G. §3E1.1(b)]                                                       -1
26          (as set forth below)

2

**Total Offense Level:**                                                                 17

3.      The parties agree that no other specific offense characteristics apply.

4.      Pursuant to U.S.S.G. §3E1.1(a), the United States will recommend that defendant receive a two (2) level adjustment for acceptance of responsibility unless defendant (a) fails to make a complete factual basis for the guilty plea at the time it is entered; (b) is untruthful with the Court or probation officers; (c) denies involvement in the offense or provides conflicting statements regarding defendant's involvement; (d) attempts to withdraw the guilty plea; (e) engages in criminal conduct; (f) fails to appear in court; or (g) violates the conditions of defendant's pretrial release conditions.

5.      Under U.S.S.G. §3E1.1(b), the United States will, in its sole discretion, make a motion for an additional one (1) level adjustment for acceptance of responsibility prior to sentencing if defendant timely notifies the United States of his intention to plead guilty, thereby permitting the United States to avoid preparing for trial and allowing for the efficient allocation of resources.

6.      Defendant's Criminal History Category will be determined by the Court. The parties understand and accept that the Court will consider defendant's prior convictions, if any, in calculating his Criminal History Category.

7.      Defendant agrees that the Court may consider any counts dismissed under this agreement, along with all other relevant conduct whether charged or uncharged, in determining the applicable sentencing guidelines range, the propriety and extent of any departure from that range, and the determination of the sentence to be imposed after consideration of the sentencing guidelines and all other relevant factors.

**D.   Other Sentencing Matters**

1.      The United States will recommend that Defendant be sentenced to the low-end of the Guideline range unless Defendant commits any of the acts that could result in a loss of the downward adjustment for acceptance of responsibility. In exchange for the recommendation, the Defendant will not seek a downward adjustment pursuant to Title 18, United States Code, Section 3553, from any

3

1    sentence that may be imposed within the Guideline range contemplated by the parties.

2           2.      The parties agree that the Guideline calculations are based on information now known

3    and could change upon investigation by the United States Probation Office. It is possible that factors

4    unknown or unforeseen by the parties to the plea agreement may be considered in determining the

5    offense level, specific offense characteristics, and other related factors. In that event, defendant will

6    not withdraw defendant's plea of guilty.

7           3.      The stipulations in this agreement do not bind either the United States Probation

8    Office or the Court. Both Defendant and the United States are free to: (a) supplement the facts by

9    supplying relevant information to the United States Probation Office and the Court, and  (b) correct

10   any and all factual misstatements relating to the calculation of the sentence.

11   **E.    Fines and Special Assessment**

12          1.      Defendant agrees that the Court may impose a fine due and payable immediately upon

13   sentencing.

14          2.      Defendant will pay the special assessment of $100 per count of conviction at the time

15   of sentencing.

16   **F.    Restitution**

17          Defendant agrees to make full restitution in an amount to be determined by the Court. In

18   return for defendant agreeing to make restitution for relevant conduct, the United States agrees not to

19   bring separate charges against defendant for the conduct giving rise to the relevant conduct.

20   Defendant understands that any restitution imposed by the Court may not be discharged in whole or

21   in part in any present or future bankruptcy proceeding.

22   **G.    Forfeiture**

23          1.      Defendant knowingly and voluntarily agrees to the abandonment, the civil

24   administrative forfeiture, the civil judicial forfeiture, or the criminal forfeiture of the following

25   items:

26          1.      GT gaming program "CleopatraII" GK001927 (1 of 2);

4

2.  IGT gaming program "CleopatraII" GK001927 (2 of 2);

3.  GT gaming program "King Cheetah" GK001217 (1 of 2);

4.  IGT gaming program "King Cheetah" GK001217 (2 of 2);

5.  IGT gaming program "Terminator Cyber Spin" GK001844 (1 of 2);

6.  IGT gaming program "Terminator Cyber Spin" GK001844 (2 of 2);

7.  IGT gaming program "Pharaohs Gold" GK001558 (1 of 3);

8.  IGT gaming program "Pharaohs Gold" GK001558 (2 of 3);

9.  IGT gaming program "Pharaohs Gold" GK001558 (3 of 3);

10.  gaming program "Aztech Temple" GK001510 (1 of 3);

11.  IGT gaming program "Aztech Temple" GK001510 (2 of 3);

12.  IGT gaming program "Aztech Temple" GK001510 (3 of 3);

13.  IGT gaming program "Coyote Moon" GK001232 (1 of 3);

14.  IGT gaming program "Coyote Moon" GK001232 (2 of 3);

15.  IGT gaming program "Coyote Moon" GK001232 (3 of 3);

16.  IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Latino Machino" (1 of 3);

17.  IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Latino Machino" (2 of 3);

18.  IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Latino Machino" (3 of 3);

19.  IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Lion Dance" GK002092 (1 of 4);

5

20. IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Lion Dance" GK002092 (2 of 4);

21. IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Lion Dance" GK002092 (3 of 4);

22. IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Lion Dance" GK002092 (4 of 4);

23. IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Bombay" (1 of 3);

24. IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Bombay" (2 of 3);

25. IGT conversion kit containing: button wire harness assembly, mother board, E2 chip, 044 CPU board, and Flash board described as "Bombay" (3 of 3);

26. Button assembly received from Southeast Gaming, Inc.;

27. 8 each 044 CPU boards returned from Southeast Gaming, Inc.;

28. Programmer received from FE Electronic;

29. DVD-R containing IGT programs received from Southeast Gaming, Inc.;

30. IGT gaming machine, serial number 1073240;

31. IGT gaming machine, serial number 886066;

32. IGT gaming machine, serial number 1053178;

33. IGT gaming machine, serial number 1073234;

34.   IGT gaming machine, serial number 924295;

35.   IGT gaming machine, serial number 905366;

36.   IGT gaming machine, serial number 933498;

37.   IGT gaming machine, serial number 588607;

38.   IGT gaming machine, serial number 1036990;

39.   IGT gaming machine, serial number 1073233;

40.   IGT gaming machine, serial number 541838;

41.   IGT gaming machine, serial number 485423;

42.   IGT gaming machine, serial number 948309;

43.   IGT gaming machine, serial number 1073241;

44.   IGT gaming machine, serial number 85431;

45.   IGT gaming machine, serial number 973161;

46.   IGT gaming machine, serial number 933499;

47.   IGT gaming machine, serial number 485410;

48.   IGT gaming machine, serial number 9073237;

49.   IGT gaming machine, serial number 1053177;

50.   IGT gaming machine, serial number 9073238;

51.   IGT gaming machine, serial number 1073230;

52.   IGT gaming machine, serial number 1036989;

53.   IGT gaming machine, serial number 834460;

54.   IGT gaming machine, serial number 549559;

55.   IGT gaming machine, serial number 1073232;

56.   IGT gaming machine, serial number 1036979;

57.   IGT gaming machine, serial number 769105;

58.   IGT gaming machine, serial number 769122;

59.   IGT gaming machine, serial number 1073235;

7

60.   IGT gaming machine, serial number 769138;

61.   IGT gaming machine, serial number 1073239;

62.   IGT gaming machine, serial number 917238;

63.   IGT gaming machine, serial number 1036987;

64.   IGT gaming machine, serial number 588608;

65.   IGT gaming machine, serial number 1036992;

66.   IGT gaming machine, serial number 1017515;

67.   Computer, Dell PC, serial number GR2RR21;

68.   Computer, Dell PC, serial number G1MQR21;

69.   Computer, Dell PC, serial number B7RLG41;

70.   Computer, Dell PC, serial number DNJYQ21;

71.   Cell phone, Cingular Treo, serial number PTCG0B36M02T;

72.   7.2 Meg DSC-W55 Sony Cybershot;

73.   USB Memorex 512MB;

74.   Dell PC, serial number GX2062400MT-06;

75.   SeaGate external hard drive, serial number 5LY24P2F;

76.   164 miscellaneous CD's and DVD's;

77.   19 each circuit boards;

78.   1 USB and 1 Sandisk;

79.   3 boxes of slot machine glass;

80.   Soldering machine A014159;

81.   Miscellaneous EEPROM's;

82.   15 circuit boards in box;

83.   17 wire harnesses;

84.   Miscellaneous pieces of slot machine glass;

85.   Bellan USB 802.11G-54MBPS / 8 CD's;

86.    IGT gaming machine, serial number 1256068;

87.    IGT gaming machine, serial number 1184445;

88.    IGT gaming machine, serial number 1184396;

89.    Aoyue BGA9000A bench-top rework station;

90.    Microdia 20GB compact flash card;

91.    Sandisk extreme IV 4.0GB compact flash card;

92.    Fuji film DPC-64 picture card;

93.    Sony 2GB SD card, serial number MSX-M2GN-E418Z1B;

94.    Sony 256MB SD card, serial number MSX-M256N-K327Y1A;

95.    Sony 32MB SD card, serial number MSH-M32-I41350B;

96.    10 CD-R's for turbo flash gang programmer;

97.    5 miscellaneous CD-R's;

98.    IGT serial plates;

99.    Hard drive, serial number X1C317DF;

100.    Hard drive, serial number K1HNK7TH;

101.    Hard drive, serial number NN11T491BFEY;

102.    20GB Fujitsu hard drive, serial number NN11T471BCHO;

103.    Apple Iphone, model A1241;

104.    10 each EEPROMS;

105.    5 CD-R's found in safe;

106.    Internal hard drive, serial number 5FBD9A68;

107.    Hitachi Travelstar 20GB hard drive, serial number Q1G38Z5B, Kiosk micro chip, Microdia 20GB compact flash, USB device;

108.    USB modem for MacBook, serial number E02CA10830720101;

109.    Computer, key R4KMQ-M3WDG-D7TGG- C798G-C92WG;

110.    Computer, key PX24D-29FFY-2MDPG-G3VX9-WGMRJ;

111.   Computer, key FJXPG-2Z77G-DEH2C-VRGCC-P7JX3;

112.   Computer, key V3GGB-Y4WC8-V3K8Q-CJXW4-WTG8M;

113.   Computer, serial number 95085H76106Q44000174;

114.   Computer, serial number E8223124111Q4400014900;

115.   Computer, key P3DYX-CCXMP-DDTCD-DVGWW-TCXXQ;

116.   Computer, "Titan";

117.   Computer, with "Spire" and "Super Rock" components;

118.   IGT game theme prints;

119.   Box of IGT labels;

120.   IGT blueprints;

121.   Flash card reader;

122.   SIMM card reader;

123.   Intelligent universal programmer;

124.   Martin Hot-Reball-03, serial number HR03-03077;

125.   Azkoyen coin validator programmer (1 of 2);

126.   Azkoyen coin validator programmer (2 of 2);

127.   2 Advantach Equipment Lab Tool-T480 turbo flash gang programmers with flash board;

128.   MacBook Air, serial number W88131F018X;

129.   HP laptop computer, serial number SL399130;

130.   Suitcase programmer;

131.   Safe (empty);

132.   27.03 LVL ($55.13 USD) found in safe; and

133.   a criminal forfeiture money judgment in the amount of $151,800.00.

2.   Defendant knowingly and voluntarily agrees to abandon or to forfeit the property to the United States.

3.     Defendant knowingly and voluntarily agrees to relinquish all right, title, and interest in the property.

4.     Defendant knowingly and voluntarily agrees to waive his right to any abandonment proceedings, any civil administrative forfeiture proceedings, any civil judicial forfeiture proceedings, or any criminal forfeiture proceedings ("proceedings") of the property.

5.     Defendant knowingly and voluntarily agrees to waive service of process of any and all documents filed in this action or any proceedings concerning the property arising from the facts and circumstances of this case.

6.     Defendant knowingly and voluntarily agrees to waive any further notice to him, his agents, or his attorney regarding the abandonment or the forfeiture and disposition of the property.

7.     Defendant knowingly and voluntarily agrees not to file any claim, answer, petition, or other documents in any proceedings concerning the property.

8.     Defendant knowingly and voluntarily agrees to waive the statute of limitations, the CAFRA requirements, Fed. R. Crim. P. 7(c)(2), 32.2(a), and 32.2(b)(3), and the constitutional due process requirements of any abandonment proceeding or any forfeiture proceeding concerning the property.

9. Defendant knowingly and voluntarily agrees to waive his right to a jury trial on the forfeiture of the property.

10.     Defendant knowingly and voluntarily agrees to waive (a) all constitutional, legal, and equitable defenses to, (b) any constitutional or statutory double jeopardy defense or claim concerning, and (c) any claim or defense under the Eighth Amendment to the United States Constitution, including, but not limited to, any claim or defense of excessive fine in any proceedings concerning the property.

11.     Defendant knowingly and voluntarily agrees to the entry of an Order of Forfeiture of the property to the United States.

11

12.     Defendant knowingly and voluntarily agrees and understands the abandonment, the civil administrative forfeiture, the civil judicial forfeiture, or the criminal forfeiture of the property shall not be treated as satisfaction of any assessment, fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to the abandonment or the forfeiture.

**H.    Waiver of Appeal**

Defendant, in exchange for the concessions made by the United States in this plea agreement, knowingly and expressly waives the right to appeal any sentence that is imposed within the applicable Sentencing Guideline range as determined by the Court, further waives the right to appeal the manner in which that sentence was determined on the grounds set forth in Title 18, United States Code, Section 3742, and further waives the right to appeal any other aspect of the conviction or sentence, including any order of restitution. Defendant reserves only the right to appeal any portion of the sentence that is an upward departure from the sentencing guideline range determined by the Court. Defendant also waives all collateral challenges, including any claims under Title 28, United States Code, Section 2255, to his conviction(s), sentence(s) and the procedure by which the Court adjudicated guilt and imposed sentence, except non-waivable claims of ineffective assistance of counsel.

**I.    Additional Promises, Agreements, and Conditions**

1.     In exchange for the United States entering into this agreement, defendant agrees that (a) the facts set forth in Section IV of this Plea Agreement shall be admissible against defendant under Fed. R. Evid. 801(d)(2)(A) in the following circumstances: (1) for any purpose at sentencing; and (2) in any subsequent proceeding, including a trial in the event defendant does not plead guilty or withdraws defendant's guilty plea, to impeach or rebut any evidence, argument or representation offered by or on defendant's behalf; and (b) defendant expressly waives any and all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 with regard to the facts set forth in Section IV of the Plea Agreement to the extent set forth above.

12

1     2.     The parties agree that no promises, agreements, and conditions have been entered into
2  other than those set forth in this plea memorandum, and not will be entered into unless in writing and
3  signed by all parties.

4  **J. Cooperation**

5     1.     Defendant agrees, if requested by the United States, to provide complete and truthful
6  information and testimony concerning his knowledge of all other persons who are committing or have
7  committed offenses against the United States, and agrees to cooperate fully with the United States in
8  the investigation and prosecution of such persons. Defendant agrees that the information he provides
9  can be used against him to establish relevant conduct. Defendant understands that his cooperation is
10 based on the following terms and conditions:

11         (a)     Defendant shall cooperate truthfully, completely and forthrightly with the
12 United States Attorney's Office for the District of Nevada (this Office) and other federal, state and
13 local law enforcement authorities identified by this Office in any matter as to which the government
14 deems the cooperation relevant.

15         (b)     Defendant shall promptly turn over to the government or other law
16 enforcement authorities or direct such law enforcement authorities to any and all evidence of crime;
17 all contraband and proceeds of crime; and all assets traceable to such proceeds of crime.

18         (c)     Defendant shall submit a full and complete accounting of all his financial
19 assets, whether such assets are in his name or in the name of a third party.

20         (d)     Defendant shall testify fully and truthfully before any grand jury in the District
21 of Nevada, and elsewhere, and at all trials of cases or other court proceedings in the District of Nevada
22 and elsewhere, at which his testimony may be deemed relevant by the government.

23         (e)     Defendant agrees not to commit any criminal violation of local, state or federal
24 law during the period of his cooperation with law enforcement authorities pursuant to this Agreement
25 or at any time prior to the sentencing in this case. The commission of a criminal offense during the
26 period of his cooperation or at any time prior to sentencing will constitute a breach of this plea

agreement and will relieve the government of all of its obligations under this agreement. However, defendant acknowledges and agrees that such a breach of this Agreement will not entitle him to withdraw his plea of guilty. Defendant further understands that, to establish a breach of this agreement, the government need only prove defendant's commission of a criminal offense by a preponderance of the evidence.

2.     Defendant acknowledges and understands that during the course of the cooperation outlined in this agreement defendant will be interviewed by law enforcement agents and/or government attorneys and that defendant has the right to have defense counsel present during these interviews. After consultation with counsel, and with counsel's concurrence, defendant knowingly and voluntarily waives this right and agrees to meet with law enforcement agents and government prosecutors outside of the presence of counsel. If at some future point counsel or defendant desire to have counsel present during interviews by law enforcement agents and/or government attorneys, the government will honor this request, and this change will have no effect on any other terms and conditions of this Agreement.

3.     Defendant knowingly and voluntarily waives or gives up all of defendant's constitutional and statutory rights to a speedy trial and speedy sentence, and agrees that the plea of guilty pursuant to this agreement will be entered at a time decided upon by the government with the concurrence of the Court. Defendant also agrees that the sentencing in this case may be delayed until defendant's cooperation has been completed, as determined by the government, so that the Court will have the benefit of all relevant information before a sentence is imposed. Defendant understands that the date for sentencing will be set by the Court.

4.     Defendant understands that the sentence in this case will be imposed in accordance with the United States Sentencing Commission's Guidelines Manual. Defendant further understands that the sentence to be imposed is a matter solely within the discretion of the Court. Defendant acknowledges that the Court is not obligated to follow any recommendation of the government at the time of sentencing or to grant a downward departure based on defendant's substantial assistance to the government, even if the government files a motion pursuant to 18 U.S.C. § 3553 (e)(1) and/or Section

1  5K1.1 of the Federal Sentencing Guidelines.

2       5.    Defendant understands that even if this Office informs the Court of defendant's

3  cooperation, substantial or otherwise, this Office reserves its full right of allocution for purposes of

4  sentencing in this matter. In particular, the United States reserves its right to recommend a specific

5  period of incarceration and fine up to the maximum sentence of incarceration and fine allowable by

6  law. In addition, if in this plea agreement the government has agreed to recommend or refrain from

7  recommending to the Court a particular resolution of any sentencing issue, the government reserves

8  its right to full allocution in any post-sentence litigation in order to defend the Court's ultimate decision

9  on such issues. Defendant further understands that the government retains its full right of allocution

10  in connection with any post-sentence motion which may be filed in this matter and/or any

11  proceeding(s) before the Bureau of Prisons. In addition, defendant acknowledges that the government

12  is not obligated and does not intend to file any post-sentence downward departure motion in this case

13  pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

14       6.    Defendant understands and agrees that Defendant will not be allowed to withdraw

15  the guilty plea entered under this agreement solely because of the harshness of the sentence imposed.

16  Such a motion to withdraw shall constitute a breach of this agreement.

17       7.    In the event the United States Attorney decides in his sole discretion that the

18  assistance provided by defendant amounts to "substantial assistance" pursuant to Section 5K1.1 of the

19  Sentencing Guidelines and Title 18, United States Code, Section 3553(e), the United States will file

20  a motion with the Court to allow the Court to consider a downward departure at the time of sentencing.

21       8.    It is understood and agreed that a motion for departure based on substantial assistance

22  shall not be made under any circumstances unless defendant's cooperation is deemed to be substantial

23  assistance by the United States Attorney. The United States has made no promise, implied or

24  otherwise, that Defendant will be granted a departure for substantial assistance. Further, no promise

25  has been made that a motion will be made for departure even if defendant complies with all of the

26  terms of this plea agreement in all respects but has been unable to provide substantial assistance as

1   determined in the sole discretion of the United States Attorney.

2       9.      The United States agrees to consider the totality of the circumstances, including but

3   not limited to the following factors, in determining whether, in the sole discretion of the United States

4   Attorney, defendant has provided substantial assistance which would merit a motion by the United

5   States for a downward departure from the applicable guidelines sentencing range:

6           (a)     The United States' evaluation of the significance and usefulness of defendant's

7   assistance;

8           (b)     The truthfulness, completeness, and reliability of any information or testimony

9   provided by defendant;

10          (c)     The nature and extent of defendant's assistance;

11          (d)     Any injury suffered, or any danger or risk of injury to defendant or defendant's

12  family resulting from defendant's assistance;

13          (e)     The timeliness of defendant's assistance.

14      10.     It is understood and agreed that in the event a motion for departure is made by the

15  United States based upon defendant's perceived substantial assistance, the United States reserves the

16  right to make a specific recommendation to the Court regarding the extent of the substantial assistance

17  departure; however, the final decision as to how much, if any, reduction in sentence is warranted

18  because of that assistance rests solely with the Court. Defendant specifically acknowledges that he has

19  been advised that in any event, the United States will not recommend probation, but will in fact

20  recommend a prison term.

21  **K.    Limitations**

22      This Plea Agreement is limited to the United States Attorney's Office for the District of

23  Nevada and cannot bind any other federal, state or local prosecuting, administrative, or regulatory

24  authority. However, this Plea Memorandum does not prohibit the United States through any agency

25  thereof, the United States Attorney's office for the District of Nevada, or any third party from initiating

26  or prosecuting any civil proceeding directly or indirectly involving the defendant, including but not

1  limited to, proceedings under the False Claims Act relating to potential civil monetary liability or by

2  the Internal Revenue Service relating to potential tax liability.

## II.

## PENALTY

1.     The maximum penalty for violating Title 18, United States Code, Section 371 (conspiracy), is no more than five years imprisonment, a fine of not more than $250,000 or both.

2.     Defendant is subject to supervised release for a term not exceeding three years. Supervised release is a period of time following imprisonment during which Defendant will be subject to various restrictions and requirements. Defendant understands that if Defendant violates one or more of the conditions of any supervised release imposed, Defendant may be returned to prison for all or part of the term of supervised release, which could result in Defendant serving a total term of imprisonment greater than the statutory maximum stated above.

4.     Defendant must pay a special assessment of $100 for each count of conviction.

5.     Defendant is required to pay for the costs of imprisonment, probation, and supervised release, unless the defendant establishes that defendant does not have the ability to pay such costs, in which case the Court may impose an alternative sanction such as community service.

## III.

## ELEMENTS

A.     **Conspiracy (18 U.S.C. § 371)**

The essential elements for the crime of conspiracy, in violation of Title 18, United States Code, Section 371, are the following:

1.     Beginning on or about August 31, 2007 and ending on or about April 15, 2009, there was an agreement between two or more persons to:

(a)     criminally infringe on a copyright in violation of 17 U.S.C. § 506(a)(1)(A) and 18 U.S.C. § 2319(b)(1);

(b)     knowingly traffic in counterfeit and illicit labels in violation of 18 U.S.C. § 2318(a) and (c)(3); and

1        (c)    intentionally traffic in counterfeit IGT gaming software and machine parts in violation of 18 U.S.C. § 2320(a);

2

3        2.    the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

4        3.    one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all of you agreeing on a particular

5    overt act that you find was committed.

6    9th Cir. Model Jury Instr. 8.16 (2003).

7    **IV.**

8    **FACTS THAT SUPPORT GUILTY PLEA**

9        1.    Defendant is pleading guilty because the defendant is guilty of the charged

10   offense.

11       2.    In pleading to the offense(s), defendant acknowledges that if defendant elected to

12   go to trial instead of entering this plea, the United States could prove facts sufficient to establish

13   defendant's guilt beyond a reasonable doubt.

14       3.    Defendant specifically admits and declares under penalty of perjury that all of the

15   facts set forth below are true and correct:

16       Beginning no later than August 31, 2007, and continuing through on or about April 15,

17   2009, Rodolfo Cabrera conspired with Henry Mantilla and with others known and unknown to (a)

18   criminally infringe on copyrights belonging to International Game Technology (IGT); (b)

19   knowingly traffic in counterfeit and illicit labels; and (c) intentionally traffic in counterfeit IGT

20   gaming software and machine parts.

21   **A.**    **Background of the counterfeited technology**

22       IGT is a company headquartered in Reno, Nevada, that designs, manufactures and

23   distributes gaming machines.  Gaming machines are comprised of a metal cabinet that houses LCD

24   video screens, game theme display glass, bill collectors and a series of buttons that can vary with

25   each game.  Inside IGT's gaming machines are components analogous to computers:

26       (1)    <u>038, 039 and 044 boards</u> are three series of boards that act as a central processing unit (CPU).  Older CPUs like the 039-series interfaced with games stored on

SIMM cards.  The most recent iteration, the 044 board, interfaces with game cards, which incorporates anti-counterfeiting measures.

(2)   <u>Game cards</u> contain IGT's game software.  These game cards contain numerous chips that contain the game software, and programs that operate a gaming machines' lights, sounds, controls and other features.

(3)   <u>Motherboards</u> allow game software to interact with the machine's CPU, and other machine components such as lights, controls, power, and the LCD video screen.

**B.       December 2007: Cabrera and Mantilla sell 15 illicit copies of IGT games**

Henry Mantilla operated Southeast Gaming, Inc.  In December 2007, Mantilla told a confidential informant (CI) that Mantilla bought and sold IGT gaming machine parts and game software.  A week later, Mantilla faxed to the CI in Nevada a list of 41 IGT games available for purchase.  The CI ordered 15 IGT game cards in exchange for six 044 boards and $7,920.  As Mantilla instructed,  the CI sent these six 044 boards to FE.Electronic, a company in Riga, Latvia.  FE.Electronic is owned and operated by Rodolfo Cabrera.

The CI received 15 game cards in Las Vegas, Nevada.  Although one game card was non-operational, the remainder of the 14 game cards were fully operational and contained illicit copies of IGT gaming software.  Mantilla also sent an e-mail containing pictures and instructions how to circumvent IGT's anti-counterfeiting features on 044 boards so they would accept the illicit game cards.  Notably, some of these pictures showed "jumper wires" designed to bypass IGT's authentication features.  Similarly, the 15 game cards contained 12 unauthorized modifications which circumvented IGT's security features.

These 15 game cards bore counterfeit labels bearing the IGT registered trademark.  At no time was Mantilla or Cabrera ever authorized to copy or distribute IGT gaming programs or to manufacture or distribute gaming equipment bearing the IGT trademarked logo.  IGT would have sold these 15 game cards for at least $2,300.00 each.

19

**C.      Summer 2008: Mantilla sells 10 IGT conversion kits – which are provided by Cabrera's company, FE.Electronic**

In April 2008, Mantilla emailed the CI an updated list of games and other items for sale, and the CI ordered 10 conversion kits.  A conversion kit changes an older IGT gaming machine's game theme to function like a newer model.  As Mantilla explained, the kits included an 044 board loaded with a game theme, an "E2 microchip" already programmed with a license code, a motherboard and a button harness assembly.  Notably, IGT created the E2 microchip with authentication features to prevent illicit game copies from working with an IGT 044 board.

On July 14, 2008, the CI received in Las Vegas, Nevada, a package of 10 conversion kits from FE.Electronic, Kveles 15-17, Riga, Latvia.  The package contained ten 044 boards with game cards loaded with IGT games, ten button harnesses, and nine motherboards.  These game cards had the same illicit modifications as the game cards previously received, and when plugged into illicitly modified 044 boards, contained unauthorized copies of IGT games.

Further, labels bearing the IGT registered trademark were affixed to four of the ten flash cards.  (The other six flash cards bore handwritten labels identifying the game theme.)  Neither Mantilla nor Cabrera were ever authorized to copy or distribute IGT gaming programs or to manufacture or distribute gaming equipment bearing the IGT trademarked logo.  IGT's games are never distributed with handwritten labels.  The value of these 10 conversion kits is at least $2,300.00 each.

**D.      October 2008: Mantilla, Cabrera and the CI form a partnership**

Starting in October 2008, Mantilla proposed that the CI partner with him and Cabrera to convert IGT gaming machines to new game themes and sell these upgraded machines.  Notably, Mantilla said that they could buy IGT 044 boards and then "just program them."  He later stated, "the programming, I'm not gonna charge."  On another occasion, Mantilla confirmed that the gaming machines were in Riga, Latvia and that it would take a week to convert the machines to new game themes and ship them to the United States.  Mantilla and Cabrera initially decided to do

1   much of the conversion work in Latvia because the machines were already in Riga, the cost of

2   labor was lower, and Cabrera possessed a programmer.  Mantilla also stated that they would make

3   their own IGT labels  and promised to send the programs to the CI in Las Vegas, Nevada, along

4   with the reference sheet containing the numbers of the game themes.  These labels, Mantilla said,

5   "look exactly the same."

6        Ultimately, Mantilla, Cabrera and the CI agreed to upgrade 30 older IGT machines with

7   new LCD screens, 044 boards, game cards, game theme glass and to sell them for $4,000.00 each.

8   Under the agreement, the total sale would be $120,000 of which 25% ($30,000) would be paid up

9   front by the buyer.  Although these gaming machines were initially to arrive from Riga, Lativa

10  "100% complete including programs, bill validators set up, everything," Mantilla later decided to

11  do part of the conversion himself to avoid paying the 30% import duty on completed games.

12  Notably, Cabrera would still handle the game programming and make game controllers and signs

13  that mimicked IGT's signs.  In the end, at least 57 IGT gaming cabinets were shipped from Latvia

14  to Mantilla, with some parts remaining to be added.

15  **E.    Cabrera and Mantilla arranged for the CI to reprogram IGT's older 039-series**
        **boards**

16

17       In addition to partnering to upgrade the newer 044 boards, Cabrera and Mantilla also

18  illicitly reprogrammed IGT's older 039 boards.  Starting no later than November 1, 2008, they told

19  the CI about a "programmer" that could be connected to a computer to copy IGT gaming software

20  onto a Single In-Line Memory Module (SIMM) card, a card used in older IGT machines that pre-

21  dated IGT's latest anti-counterfeiting measures.  Mantilla later offered to provide a programmer to

22  the CI, noting that he had 4 programmers that he was looking to sell for $15,000.00 each.

23       In February 2009, Mantilla sent a programmer to the CI, and asked the CI to help fill

24  customer orders by burning copies of IGT software.  Notably, the package arrived in Las Vegas,

25  Nevada, from Cabrera's company, FE.Electronic in Riga, Latvia, containing a programmer and a

26  CD with cloning software called "IGT Quad Clone."  This programmer, Mantilla said, was

21

1  developed "in house."  This programmer in conjunction with "IGT Quad Clone" could illicitly

2  reprogram SIMM cards with IGT game themes.  Mantilla also asked the CI to create counterfeit

3  IGT labels by purchasing a P-touch printer and using the templates that Mantilla would provide.

4          On March 17, 2009, Mantilla sent the CI in Las Vegas, Nevada, an order for 14 IGT

5  game theme programs, along with a DVD-R containing at least 41 IGT game theme programs that

6  the CI was to copy.  Altogether, Mantilla provided the CI a programmer, cloning software, and the

7  game theme programs required to reproduce IGT gaming software.  The value of each IGT game

8  theme program was at least $2,300.00 each.

9          All of Cabrera's acts were undertaken in furtherance of a jointly undertaken criminal

10  activity with Mantilla and with co-conspirators both known and unknown.  Altogether, due to

11  Cabrera's participation in the conspiracy to commit trafficking in counterfeit labels, criminal

12  copyright infringement and trafficking in counterfeit goods, he caused a loss totaling at least

13  $151,800.00.

14                                              **V.**

15                              **ACKNOWLEDGMENT**

16          Defendant acknowledges by his signature below that he has read this Memorandum of

17  Plea Agreement, that he understands the terms and conditions, and the factual basis, set forth

18  herein, that he has discussed these matters with his attorney, and that the matters set forth in this

19  Memorandum, including those facts which support a plea of Guilty, are true and correct.  The

20  undersigned defendant acknowledges that he has been advised, and understands, that by entering a

21  plea of Guilty he is waiving, that is, giving up, certain rights guaranteed to him by law and by the

22  Constitution of the United States.  Specifically, he is giving up:

23          1.      The right to be indicted by a federal grand jury;

24          2.      The right to proceed to trial by jury on the original charges, or to a trial by a judge

25  if he and the United States both agree;

26

3.   The right to confront the witnesses against him at such a trial, and to cross-examine them;

4.   The right to remain silent at such trial, with such silence not to be used against him in any way;

5.   The right, should he so choose, to testify in his own behalf at such a trial;

6.   The right to compel witnesses to appear at such a trial, and to testify in his behalf; and,

7.   The right to have the assistance of an attorney at all stages of such proceedings.

8.   The undersigned defendant, his attorney, and the attorney for the United States acknowledge that this Memorandum of Plea Agreement is the entire agreement negotiated by and agreed to by and between the parties, and that no other promise has been made or implied by either defendant, his attorney, or the attorney for the United States.

DANIEL BOGDEN
United States Attorney

5/6/10
DATED

MICHAEL CHU
Assistant United States Attorney

5/6/10
DATED

RODOLFO RODRIGUEZ CABRERA
Defendant

5/6/10
DATED

MACE YAMPOLSKY
Counsel for Defendant